IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SIKORSKY AIRCRAFT CORPORATION   )
                                )
                    Plaintiff,  )
                                )
                                )   CIVIL ACTION NO.
UNITED STATES DEPARTMENT OF DEFENSE et al.  )   1:05CV02373 (RWR)
                                )
                                )
                    Defendants. )
                                )

1. I am Jamie L. Adams, Colonel, United States Air Force, and the Chief of Staff of the Defense Contract Management Agency (DCMA). I have held this position since April 30, 2004. The statements made herein are based upon my personal knowledge.

2. The DCMA is the Department of Defense (DoD) Component that works directly with defense contractors to ensure that DoD, Federal, and allied government supplies and services are delivered on time, at projected cost, and meet all contractual performance requirements.

3. As the Chief of Staff, DCMA, one of my responsibilities is to make decisions on appeals of agency denials under the Freedom of Information Act (FOIA), 5 U.S.C. § 552.

4. On March 2, 2004, Mr. Alan M. Cohn, an investigative reporter for WTNH –TV, New Haven, CT, submitted a FOIA request for copies of all DCMA Corrective Action Requests (CARs) directed to Sikorsky Aircraft Corporation (Sikorsky) relating to production of the Black Hawk helicopter and it's variants for the entire year preceding the date of the request. Mr. Cohn also sought copies of all Sikorsky responses to these CARs.

5. DCMAE identified responsive documents totaling 393 pages. These documents are CARs and the Sikorsky responses to the CARs. For the most part, the CARs are recorded on a DCMA form titled DPRO S/A – 10 SEPT 1993 and include, as enclosures, DCMA inspection notes and Sikorsky responses. Both the DCMA inspection notes and the Sikorsky responses are recorded on Sikorsky Form SA 118-7.

6. On May 7, 2004, the Defense Contract Management Agency East (DCMAE), an organizational element of DCMA, denied the FOIA request. The denial was based on 5 U.S.C. § 552(b)(4) because DCMAE concluded that release of the requested information would significantly impair DCMA's ability to obtain information from Sikorsky in the future

-2-

and would have an adverse impact on the effectiveness of the DCMA Quality Assurance Program.

7. On July 2, 2004, Mr. Cohn, through his attorney, Elias A. Alexiades, appealed the DCMAE denial to DCMA Headquarters.

8. The Deputy Director, DCMA, reviewed the appeal in November 2004 and initially decided to overturn the DCMAE denial and release all of the documents. As the documents had not been referred to Sikorsky pursuant to Executive Order 12,600, a referral was made on December 15, 2004, and Sikorsky was requested to respond by January 14, 2005. Sikorsky requested an extension until February 11, 2005, to respond, which was granted.

9. On February 11, 2005, Sikorsky, through their retained counsel, Robert K. Huffman, Miller & Chevalier, responded. The response asserted that release of the CARs and the Sikorsky responses would cause Sikorsky significant competitive harm and would significantly impair the Government's ability to obtain information from Sikorsky in the future. Additionally, Sikorsky argued that any information in the CARs and the responses to CARs were voluntary provided by Sikorsky and should not be released under the legal standard of *Critical Mass Energy Project v. NRC*, 975 F.2d 871 (D.C. Cir. 1992 (en banc).

10. The February 11, 2005, Sikorsky letter was referred to the DCMA Executive Director, Contract Management Operations, for review. On May 31, 2005, in a Memorandum for Record, the Executive Director, Contract Management Operations, rejected the Sikorsky argument of significant competitive harm, but agreed with the Sikorsky assertion that responses to CARs were voluntary. The Executive Director, Contract Management Operations, also opined that the CARs themselves should be released. In his May 31, 2005, Memorandum for Record, the DCMA Executive Director, Contract Management Operations addressed the arguments of the February 11, 2005, letter as follows:

> a. The information in CARs is not provided voluntarily by Sikorsky. Rather, pursuant to the contract, DCMA personnel are permitted access to the Sikorsky plant and have the contractual right to inspect the helicopters being manufactured by Sikorsky. Federal Acquisition Regulation (FAR) 52.246-2(c) [48 C.F.R. 52.246-2(c)], which is routinely included in contracts for supplies, provides:
>
>> The Government has the right to inspect and test all supplies called for by the contract, to the extent practicable, at all places and times, including the period of manufacture, and at any time before acceptance.
>
> Therefore, the Government has a right to inspect Sikorsky's manufacturing processes.

-3-

b. After review of a representative sampling of the CARs, release of the CARs would not cause competitive harm;

c. Even if the CARs in this matter are released, the Government's ability to obtain the information for CARs in the future would not be significantly impaired because the Government has the contractual right to inspect the helicopters being manufactured by Sikorsky.

d. The Sikorsky written responses to CARs are voluntary. While FAR 52.246-2(g) [48 C.F.R. 52.246-2(g)] provides:

> The Contractor shall remove supplies rejected or required to be corrected. However, the Contracting Officer may require or permit correction in place, promptly after notice, by and at the expense of the Contractor. The Contractor shall not tender for acceptance corrected or rejected supplies without disclosing the former rejection or requirement for correction, and, when required, shall disclose the corrective action taken.

This contract provision does not require the contractor to respond in writing to a CAR. Accordingly, there is no contractual requirement for Sikorsky to do so, and the Sikorsky written responses to CARs are entirely voluntary.

11. On December 1, 2005, I notified Sikorsky's retained counsel that DCMA had determined that the CARs, themselves, were releasable and that they would be released to Mr. Cohn on December 12, 2005. I also advised that DCMA accepted Sikorsky's assertion that responses to CARs are voluntary, and, accordingly, the Sikorsky responses to DCMA CARs would not be released. In addition, I rejected the Sikorsky arguments of substantial competitive harm and impairment of the Government's ability to obtain necessary information in the future. I enclosed with the letter a compact disc with the CARs indicating in red boxes the redactions to be made from each CAR. The redactions were the Sikorsky responses to CARs.

a. As to the impairment issue, I noted that the determination of impairment is for the Government to make, not Sikorsky, and that the DCMA determination was that a release of the CARs would not impair the Government's ability to obtain the same kind of information in the future.

b. As to the issue of substantial competitive harm, I determined that while the release of information related to contract non-conformances may be harmful to the reputation of Sikorsky, it would not cause substantial competitive harm. First, Sikorsky conceded in their February 11, 2005, letter that individual CARs would not

-4-

cause substantial competitive harm, but rather "the CARs and responses as a whole" could. Sikorsky espoused a "mosaic" approach in determining if the release of numerous CARs and their responses could cause substantial competitive harm. However, in reading the Sikorsky argument on substantial competitive harm, it was my impression that Sikorsky was afraid of the embarrassment and inquiries that might come out of the revelation of a significant number of contract nonconformances. The Sikorsky arguments on substantial competitive harm did raise the possibility that Sikorsky's competitive position could conceivably be harmed in some manner if the CARs were released, but their argument did not convince me that release of the CARs alone would likely cause substantial competitive harm. In fact, as the Sikorsky responses to the CARs are not being released, there is an even less likelihood of substantial competitive harm because the "insights" to Sikorsky's proprietary quality control system suggested in the February 11, 2005, letter are no longer possible, if, in fact, they ever were. I considered the arguments of Sikorsky based on the *Lion Raisin* case, but I found them to be inapplicable to the CARs. The information sought in *Lion Raisin* was specific information that could be used, either directly or inferentially, to the advantage of a competitor. There is no information in the CARs that can be used directly or inferentially by a competitor except to assert that Sikorsky's quality control system appears to be inadequate, and that is speculative at best. That is far different from the *Lion Raisin* case.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 22nd day of MARCH, 2006.

Jamie L. Adams
Colonel, USAF
Chief of Staff