IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **SIKORSKY AIRCRAFT CORPORATION,** )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>**UNITED STATES DEPARTMENT OF DEFENSE et al.** )<br>)<br>Defendants. )<br>) | Civil Action Number: 05-2373 (RWR) |

**DEFENDANTS' STATEMENT OF MATERIAL FACTS
WHICH ARE NOT IN GENUINE DISPUTE**

Pursuant to LCvR 7(h) and in support of Defendant's Motion for Summary Judgment, Defendant respectfully submits this statement of material facts as to which there are no genuine disputes.

1. Defense Contract Management Agency (DCMA) is the Department of Defense (DoD) Component that works directly with Defense contractors to ensure that DoD, Federal, and allied government supplies and services are delivered on time, at projected cost, and meet all contractual performance requirements.  Defendant's Exhibit 1, Declaration of Colonel Jamie L. Adams ¶ 2; (Hereinafter DEX # ¶)

2. Plaintiff is a large defense contractor designing and manufacturing helicopters for all five branches of the United States Armed Forces.  Compl ¶ 6.

3. Pursuant to its contracts with plaintiff, DCMA personnel sometimes issue Corrective Action Notices (CARs) to Sikorsky based upon information they obtain by monitoring Sikorsky's

operations and inspecting its operations. Compl ¶ 11.

4. Federal Acquisition Regulation (FAR) 52.246-2(c)[1], is routinely included in contracts for supplies and provides:

> The Government has the right to inspect and test all supplies called for by the contract, to the extent practicable, at all places and times, including the period of manufacture, and at any time before acceptance.

DEX 1 ¶ 10a.

5. On March 2, 2004, Mr. Alan M. Cohn, an investigative reporter for WTNH -TV, New Haven, CT, submitted a FOIA request for copies of all DCMA Corrective Action Requests (CARs) directed to Sikorsky Aircraft Corporation (Sikorsky) relating to production of the Black Hawk helicopter and it's variants for the entire year preceding the date of the request. Mr. Cohn also sought copies of all Sikorsky responses to these CARs. DEX 1 ¶ 4.

6. The Defense Contract Management Agency East (DCMAE) identified responsive documents totaling 393 pages. These documents are CARs and the Sikorsky response to the CARs. For the most part, the CARs are recorded on a DCMA form titled DPRO S/A - 10 SEPT 1993 and include, as enclosures, DCMA inspection notes and Sikorsky responses. Both the DCMA inspection notes and the Sikorsky responses are recorded on Sikorsky Form SA 118-7. DEX 1 ¶ 5.

7. On May 7, 2004, DCMAE, an organizational element of DCMA, denied the FOIA request. The denial was based on 5 U.S.C. § 552(b)(4) because DCMAE concluded that release of the requested information would significantly impair DCMA's ability to obtain information from

---

[1] FAR 52.246-2(c) is published in the Code of Federal Regulations at 48 C.F.R. § 52.246-2(c).

Sikorsky in the future and would have an adverse impact on the effectiveness of the DCMA Quality Assurance Program. DEX 1 ¶ 6.

8. On July 2, 2004, Mr. Cohn, through his attorney, Elias A. Alexiades, appealed the DCMAE denial to DCMA Headquarters. DEX 1 ¶ 7.

9. The Deputy Director, DCMA, reviewed the appeal in November 2004 and initially decided to overturn the DCMAE denial and release all of the documents. As the documents had not been referred to Sikorsky pursuant to Executive Order 12,600, a referral was made on December 15, 2004, and Sikorsky was requested to respond by January 14, 2005. Sikorsky requested an extension until February 11, 2005, to respond, which was granted. DEX 1 ¶ 8.

10. On February 11, 2005, Sikorsky, through their retained counsel, Robert K. Huffman, Miller & Chevalier, responded. The response asserted that release of the CARs and the Sikorsky responses would cause Sikorsky significant competitive harm and would significantly impair the Government's ability to obtain information from Sikorsky in the future. Additionally, Sikorsky argued that any information in the CARs and the responses to CARs were voluntary provided by Sikorsky and should not be released under the legal standard of <u>Critical Mass Energy Project v. NRC</u>, 975 F.2d 871 (D.C. Cir. 1992) (en banc). DEX 1 ¶ 9.

11. The February 11, 2005, Sikorsky letter was referred to the DCMA Executive Director, Contract Management Operations, for review. On May 31, 2005, in a Memorandum for Record, the Executive Director, Contract Management Operations, rejected the Sikorsky argument of significant competitive harm, but agreed with the Sikorsky assertion that responses to CARs were voluntary. DEX 1 ¶ 10.

12. The Executive Director, Contract Management Operations, also opined that the CARs

themselves should be released. In his May 31, 2005, Memorandum for Record, the DCMA Executive Director, Contract Management Operations addressed the arguments of the February 11, 2005, letter as follows: The information in CARs is not provided voluntarily by Sikorsky. Rather, pursuant to the contract, DCMA personnel are permitted access to the Sikorsky plant and have the contractual right to inspect the helicopters being manufactured by Sikorsky pursuant to FAR 52.246-2(c). Based on the above reasoning DCMA concluded the Government has a right to inspect Sikorsky's manufacturing processes. DEX 1 ¶ 10a.

13. After review of a representative sampling of the CARs, DCMA determined that release of the CARs would not cause competitive harm. DEX 1 ¶ 10b.

14. Even if the CARs in this matter are released, the Government's ability to obtain the information for CARs in the future would not be significantly impaired because the Government has the contractual right to inspect the helicopters being manufactured by Sikorsky. DEX 1 ¶ 10c.

15. DCMA determined that Sikorsky's written responses to CARs are voluntary based on FAR 52.246-2(g). This contract provision does not require the contractor to respond in writing to a CAR. Accordingly, DCMA determined there is no contractual requirement for Sikorsky to do so, and the Sikorsky written responses to CARs are entirely voluntary. DEX 1 ¶ 10d

16. On December 1, 2005, Colonel Jamie Adams notified Sikorsky's retained counsel that DCMA had determined that the CARs, themselves, were releasable and that they would be released to Mr. Cohn on December 12, 2005. He also advised that DCMA accepted Sikorsky's assertion that responses to CARs are voluntary, and, accordingly, the Sikorsky responses to DCMA CARs would not be released. In addition, Colonel Adams rejected the Sikorsky

arguments of substantial competitive harm and impairment of the Government's ability to obtain necessary information in the future. He enclosed with the letter a compact disc with the CARs indicating in red boxes the redactions to be made from each CAR.  The redactions were the Sikorsky responses to CARs. DEX 1 ¶ 11.

17.  As to the impairment issue, Colonel Adams noted that the determination of impairment is for the Government to make and not Sikorsky, and that the DCMA determination was that a release of the CARs would not impair the Government's ability to obtain the same kind of information in the future.   DEX 1 ¶ 11a.

18.  As to the issue of substantial competitive harm, Colonel Adams determined that while the release of information related to contract non-conformances may be harmful to the reputation of Sikorsky, it would not cause substantial competitive harm.  The basis of Colonel Adam's decision was: First, Sikorsky conceded in their February 11, 2005, letter that individual CARs would not cause substantial competitive harm, but rather "the CARs and responses as a whole" could.  Sikorsky espoused a "mosaic" approach in determining if the release of numerous CARs and their responses could cause substantial competitive harm.  However, in reading the Sikorsky argument on substantial competitive harm, it appeared that Sikorsky was afraid of the embarrassment and inquiries that might come out of the revelation of a significant number of contract nonconformances.  The Sikorsky arguments on substantial competitive harm did raise the possibility that Sikorsky's competitive position could conceivably be harmed in some manner if the CARs were released, but their argument did not convince Colonel Adams  that release of the CARs alone would likely cause substantial competitive harm.  In fact, as the Sikorsky responses to the CARs are not being released, there is an even less likelihood of substantial

competitive harm because the "insights" to Sikorsky's proprietary quality control system suggested in the February 11, 2005, letter are no longer possible, if, in fact, they ever were. Colonel Adams considered the arguments of Sikorsky based on <u>Lion Raisins Inc. v. U.S. Department of Agriculture</u>, 354 F. 3d 1072 (9th Cir.  2004), but found that case's reasoning to be inapplicable to the CARs.  The information sought in Lion Raisins was specific information that could be used, either directly or inferentially, to the advantage of a competitor.  There is no information in the CARs that can be used directly or inferentially by a competitor except to assert that Sikorsky's quality control system appears to be inadequate, and that is speculative at best.  That is far different from the <u>Lion Raisins</u> case.  DEX 1 ¶ 11b.

        Respectfully submitted,


        _____
        /s
        KENNETH L. WAINSTEIN, D.C. Bar # 451058
        United States Attorney


        _____
        /s
        RUDOLPH CONTRERAS D.C. Bar No.  434122
        Assistant United States Attorney


        _____
        /s
        KEVIN K. ROBITAILLE
        Special Assistant U.S. Attorney
        Civil Division
        555 Fourth St., N.W.
        Washington, D.C.  20530
        202-353-9895  / FAX 202-514-8780