IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SIKORSKY AIRCRAFT CORPORATION,

Plaintiff,

v.

UNITED STATES DEPARTMENT OF DEFENSE, et al.

Defendants.

Civil Action No.: 05-2373 (RWR)

**PLAINTIFF'S COUNTERSTATEMENT OF FACTS**

In accordance with Local Civil Rule 56.1 of the United States District Court for the District of Columbia, Plaintiff Sikorsky Aircraft Corporation hereby respectfully submits its counter-statement of facts in response to Defendant's Statement of Material Facts Which Are Not In Genuine Dispute.

1. Defense Contract Management Agency (DCMA) is the Department of Defense (DoD) Component that works directly with Defense contractors to ensure that DoD, Federal, and allied government supplies and services are delivered on time, at projected cost, and meet all contractual performance requirements. Defendant's Exhibit 1, Declaration of Colonel Jamie L. Adams ¶ (Hereinafter DEX # ¶).

**Response:**

Agreed.

2. Plaintiff is a large defense contractor designing and manufacturing helicopters for all five branches of the United States Armed Forces. Compl. ¶ 6.

**Response:**

Agreed.

3. Pursuant to its contracts with plaintiff, DCMA personnel sometimes issue Corrective Action Notices (CARs) to Sikorsky based upon information they obtain by monitoring Sikorsky's operations and inspecting its operations. Compl. ¶ 11.

**Response:**

Plaintiff agrees that DCMA personnel sometimes issue CARs to it based upon information they obtain by monitoring Sikorsky's operations and inspecting its operations. Plaintiff disagrees that DCMA personnel undertake such activities pursuant to its contracts with Plaintiff as Plaintiff has no contracts with DCMA. Furthermore, whether DCMA personnel undertake action pursuant to contracts is a statement of law to which no response is required.

4. Federal Acquisition Regulation ("FAR") 52.246-2(c), is routinely included in contracts for supplies and provides:

> The Government has the right to inspect and test all supplies called for by the contract, to the extent practicable, at all places and times, including the period of manufacture, and at any time before acceptance.

DEX 1 ¶10a.

**Response:**

Agreed.

5. On March 2, 2004, Alan M. Cohn, an investigative reporter for WTNH-TV, New Haven, CT, submitted a FOIA request for copies of all DCMA Corrective Action Requests (CARs) directed to Sikorsky Aircraft Corporation (Sikorsky) relating to production of the Black Hawk helicopter and its variants for the entire year preceding the date of the request. Mr. Cohn also sought copies of all Sikorsky responses to these CARS. DEX 1 ¶ 4.

**Response:**

Agreed.

6. The Defense Contract Management Agency East (DCMAE) identified responsive documents totaling 393 pages. These documents are CARs and the Sikorsky response to the CARs. For the most part, the CARs are recorded on a DCMA form titled DPRO S/A - 10 SEPT 1993 and include, as enclosures, DCMA inspection notes and Sikorsky responses. Both the DCMA inspection notes and the Sikorsky responses are recorded on Sikorsky Form SA 18-7. DEX 1 ¶ 5.

**Response:**

Agreed.

7. On May 7, 2004, DCMAE, an organizational element of DCMA, denied the FOIA request. The denial was based on 5 U.S.C. § 522(b)(4) because DCMAE concluded that release of the requested information would significantly impair DCMA's ability to obtain information from Sikorsky in the future and would have an adverse impact on the effectiveness of the DCMA Quality Assurance Program. DEX 1 ¶ 6.

**Response:**

Plaintiff agrees that DCMAE denied Mr. Cohn's FOIA request in a letter dated May 7, 2004, based on 5 U.S.C. § 522(b)(4) on the grounds that release of the information would significantly impair DCMA's ability to obtain information from it and other contractors in the future. The May 7, 2004 letter, which is part of the Administrative Record, speaks for itself. Plaintiff disagrees with Defendant's description of the DCMAE decision and its rationale to the extent it is based upon materials outside the Administrative Record.

<YiF>617137.1</YiF>

8. On July 2, 2004, Mr. Cohn, through his attorney, Elias A. Alexiades, appealed the DCMA denial to DCMA Headquarters. DEX 1 ¶ 7.

**Response:**

Plaintiff agrees that Mr. Cohn's attorney, Elias A. Alexiades, appealed the DCMAE denial to DCMA headquarters on July 2, 2004. Mr. Alexiades' July 2, 2004 appeal letter, which is part of the Administrative Record, speaks for itself. Plaintiff disagrees with Defendant's description of the July 2, 2004 appeal to the extent it is based upon materials outside the administrative record.

9. The Deputy Director, DCMA, reviewed the appeal in November 2004 and initially decided to overturn the DCMAE denial and release all of the documents. As the documents had not been referred to Sikorsky pursuant to Executive Order 12,600, a referral was made on December 15, 2004, and Sikorsky was requested to respond by January 14, 2005. Sikorsky requested an extension until February 11, 2005, to respond, which was granted. DEX 1 ¶ 8.

**Response:**

Plaintiff agrees that the Deputy Director, DCMA advised Plaintiff by letter dated December 15, 2004 that he had preliminarily decided to release the documents (with some redactions), but would give Plaintiff until January 14, 2005, to respond to his preliminary decision. Plaintiff further agrees that it requested an extension until February 11, 2005, to respond, which request DCMA approved. DCMA's December 15, 2004 letter, Plaintiff's request for extension, and DCMA's grant of the request, which are all part of the Administrative Record, speak for themselves. Plaintiff disagrees with Defendant's description of these documents and their rationale to the extent that they are based on materials outside the Administrative Record.

10. On February 11, 2005, Sikorsky, through their retained counsel, Robert K. Huffman of Miller & Chevalier, responded. The response asserted that release of the CARs and the Sikorsky

<YiF>617137.1</YiF>

responses would cause Sikorsky significant competitive harm and would significantly impair the Government's ability to obtain information from Sikorsky in the future. Additionally, Sikorsky argued that any information in the CARs and the responses to CARs were voluntary [sic] provided by Sikorsky and should not be released under the legal standard of Critical Mass Energy Project v. NRC, 975 F.2d 871 (D.C. Cir. 1992) (en banc). DEX 1 ¶ 9.

**Response:**

Plaintiff agrees that it responded on February 11, 2005, arguing that because it had voluntarily provided the information in the CARs and its responses to CARs, those documents should not be released under Critical Mass Energy Project v. NRC, 975 F.2d 871 (D.C. Cir. 1992) (en banc). Plaintiff disagrees with Defendant's statement that Plaintiff asserted that release of the CARs and its responses to them would cause it *significant* competitive harm and would *significantly* impair the Government's ability to obtain information from it in the future. Plaintiff's February 11, 2005 letter, which is in the Administrative Record, speaks for itself. Plaintiff further disagrees with Defendant's description of Plaintiff's February 11, 2005 letter and its rationale to the extent that it is based on materials outside the Administrative Record.

11. The February 11, 2005, Sikorsky letter was referred to the DCMA Executive Director, Contract Management Operations, for review. On May 31, 2005, in a Memorandum for Record, the Executive Director, Contract Manager Operations, rejected the Sikorsky argument of significant competitive harm, but agreed with the Sikorsky assertion that responses to CARs were voluntary. DEX 1 ¶ 10.

**Response:**

Plaintiff agrees that its February 11, 2005 letter was referred to the DCMA Executive Director, Contract Manager, who, in a May 31, 2005 Memorandum for Record, agreed that Plaintiff's

<YiF>617137.1</YiF>

responses to CARs were voluntary but rejected Plaintiff's claim of competitive harm. Plaintiff disagrees with Defendant's characterization of its competitive harm argument as "an argument of *significant* competitive harm." (emphasis added). The May 31, 2005 Memorandum for Record and Plaintiff's February 11, 2005 letter, which are part of the Administrative Record, speak for themselves. Plaintiff disagrees with Defendant's description of those documents and their rationale to the extent that Defendant has relied upon materials outside the Administrative Record.

12. The Executive Director, Contract Management Operations, also opined that the CARs themselves should be released. In his May 31, 2005, Memorandum for Record, the DCMA Executive Director, Contract Management Operations addressed the arguments of the February 11, 2005, letter as follows: The information in CARs is not provided voluntarily by Sikorsky. Rather, pursuant to the contract, DCMA personnel are permitted access to the Sikorsky plant and have the contractual right to inspect helicopters being manufactured by Sikorsky pursuant to FAR 52.256-2(c). Based on the above reasoning DCMA concluded the Government has a right to inspect Sikorsky's manufacturing processes. DEX 1 ¶ 10a.

**<u>Response:</u>**

Plaintiff agrees that the Executive Director, Contract Management Operations opined that the CARs themselves should be released on the grounds that Plaintiff did not voluntarily provide the information in the CARs, but that DCMA personnel are permitted access to Plaintiff's plant and have the right to inspect helicopters being manufactured by Plaintiff pursuant to FAR 52.256-(c). Plaintiff agrees that DCMA employed the same reasoning in its decision of December 1, 2005. The May 31, 2005 Memorandum for Record and DCMA's December 1, 2005 decision, which are part of the Administrative Record, speaks for themselves. Plaintiff disagrees with

Defendant's description of these documents and their rationale to the extent that it is based on materials outside the Administrative Record.

13. After review of a representative sampling of the CARs, DCMA determined that release of the CARs would not cause competitive harm. DEX 1 ¶ 10b.

**Response:**

Plaintiff agrees that DCMA determined that release of the CARs would not cause substantial competitive harm. Plaintiff disagrees that DCMA reached this conclusion based on a representative sampling of the CARs. DCMA's December 1, 2005 decision, which is part of the Administrative Record, speaks for itself. Plaintiff disagrees with Defendant's description of DCMA's decision and its rationale to the extent that it is based on material outside the Administrative Record.

14. Even if the CARs in this matter are released, the Government's ability to obtain the information for CARs in the future would not be significantly impaired because the Government has the contractual right to inspect the helicopters being manufactured by Sikorsky. DEX 1 ¶ 10c.

**Response:**

Plaintiff disagrees. Whether the Government has a contractual right of inspection is a statement of law to which no response is required. Plaintiff further disagrees because Defendant has relied upon material outside the Administrative Record.

15. DCMA determined that Sikorsky's written responses to CARs are voluntary based on FAR 52.246-2(g). This contract provision does not require the contractor to respond in writing to a CAR. Accordingly, DCMA determined there is no contractual requirement for Sikorsky to do so, and the Sikorsky written responses to CARS are entirely voluntary. DEX ¶ 10d.

**Response:**

Plaintiff agrees that DCMA determined that Plaintiff's written responses to CARs are voluntary based on FAR 52.246-2(g). Whether the contract provision requires the contractor to respond in writing to a CAR is a statement of law to which no response is required. DCMA's December 1, 2005 decision, which is part of the Administrative Record, speaks for itself. Plaintiff disagrees with Defendant's description of that decision and its rationale to the extent that it is based on materials outside the Administrative Record.

16. On December 1, 2005, Colonel Jamie Adams notified Sikorsky's retained counsel that DCMA had determined that the CARs, themselves, were releasable and that they would be released to Mr. Cohn on December 12, 2005. He also advised that DCMA accepted Sikorsky's assertion that responses to CARs are voluntary, and accordingly, the Sikorsky responses to DCMA CARs would not be released. In addition, Colonel Adams rejected the Sikorsky arguments of substantial competitive harm and impairment of the Government's ability to obtain necessary information in the future. He enclosed with the letter a compact disc with the CARs indicating in red boxes the redactions to be made from each CAR. The redactions were the Sikorsky responses to CARs. DEX 1 ¶ 11.

**Response:**

Plaintiff agrees that Colonel Adams notified its retained counsel on December 1, 2005, that DCMA had determined that the CARs were releasable and would be released to Mr. Cohn on December 12, 2005, but that Colonel Adams advised Plaintiff that DCMA agreed that Plaintiff's responses to CARs were voluntary, and thus would not be released. Plaintiff also agrees that Colonel Adams rejected its arguments of substantial competitive harm and impairment of the Government's ability to obtain necessary information in the future. Plaintiff further agrees that

<YiF>617137.1</YiF>

Colonel Adams enclosed with the letter a compact disc with the CARs indicating in red boxes the redactions to be made from each CAR, and that the redactions were Plaintiff's responses to CARs. DCMA's December 1, 2005 decision, which is part of the Administrative Record, speaks for itself. Plaintiff disagrees with Defendant's description of that decision and its rationale to the extent that it is based on materials outside the Administrative Record.

17. As to the impairment issue, Colonel Adams noted that the determination of impairment is for the Government to make and not Sikorsky, and that the DCMA determination was that a release of the CARs would not impair the Government's ability to obtain the same kind of information in the future. DEX 1 ¶11a.

**Response:**

Plaintiff agrees that Colonel Adams noted that the determination of impairment is for the Government, not Plaintiff, to make and that DCMA determined that a release of the CARs would not impair the Government's ability to obtain the same kind of information in the future. DCMA's December 1, 2005 decision, which is part of the Administrative Record, speaks for itself. Plaintiff disagrees with Defendant's description of that decision and its rationale to the extent that it is based on materials outside of the Administrative Record.

18. As to the issue of substantial competitive harm, Colonel Adams determined that while the release of information related to contract non-conformances may be harmful to the reputation of Sikorsky, it would not cause substantial competitive harm. The basis of Colonel Adam's decision was: First, Sikorsky conceded in their February 11, 2005, letter that individual CARs would not cause substantial competitive harm, but rather "the CARs and responses as a whole" could. Sikorsky espoused a "mosaic" approach in determining if the release of numerous CARs and their responses could cause substantial competitive harm. However, in reading the Sikorsky

Case 1:05-cv-02337-RWR Document 13 Filed 06/06/2006 Page 10 of 12

argument on substantial competitive harm, it appeared that Sikorsky was afraid of the embarrassment and inquiries that might come out of the revelation of a significant number of contract nonconformances. The Sikorsky arguments on substantial competitive harm did raise the possibility that Sikorsky's competitive position could conceivably be harmed in some manner if the CARs were released, but their argument did not convince Colonel Adams that release of the CARs alone would likely cause substantial competitive harm. In fact, as the Sikorsky responses to the CARs are not being released, there is an even less likelihood of substantial competitive harm because the "insights" to Sikorsky's proprietary quality control system suggested in the February 11, 2005, letter are no longer possible, if, in fact, they ever were. Colonel Adams considered the arguments of Sikorsky based on Lion Raisins Inc. v. U.S. Department of Agriculture, 354 F.3d 1072 (9th Cir. 2004), but found that case's reasoning to be inapplicable to the CARs. The information sought in Lion Raisins was specific information that could be used, either directly or inferentially to the advantage of a competitor. There is no information in the CARs that can be used directly or inferentially by a competitor except to assert that Sikorsky's quality control system appears to be inadequate, and that is speculative at best. This is far different from the Lion Raisins case. DEX 1 ¶ 11b.

**Response:**

Plaintiff agrees that Colonel Adams determined in the December 1, 2005 decision that the release of information related to contract non-conformances might harm Plaintiff's reputation, but would not cause it substantial competitive harm. Plaintiff agrees that Colonel Adams based this decision on his opinion that Plaintiff conceded in its February 11, 2005 letter that individual CARs would not cause substantial competitive harm, but rather "the CARs and responses as a whole" could under a "mosaic theory." Plaintiff also agrees that Colonel Adams reasoned that

<YiF>617137.1</YiF>

Plaintiff was afraid of the embarrassment and inquiries that might come out of the revelation of a significant number of contract nonconformances, and that Colonel Adams considered the arguments of Sikorsky based on Lion Raisins Inc. v. U.S. Department of Agriculture, 354 F.3d 1072 (9th Cir. 2004). Plaintiff disagrees that Colonel Adams provided the following rationale in his December 1, 2005 decision:

> [Plaintiff's] argument did not convince Colonel Adams that release of the CARs alone would likely cause substantial competitive harm. In fact, as the Sikorsky responses to the CARs are not being released, there is an even less likelihood of substantial competitive harm because the "insights" to Sikorsky's proprietary quality control system suggested in the February 11, 2005, letter are no longer possible, if, in fact, they ever were.

Plaintiff further disagrees with the following description of Colonel Adams' December 1, 2005 decision.

> The information sought in Lion Raisins was specific information that could be used, either directly or inferentially to the advantage of a competitor. There is no information in the CARs that can be used directly or inferentially by a competitor except to assert that Sikorsky's quality control system appears to be inadequate, and that is speculative at best. This is far different from the Lion Raisins case.

The December 1, 2005 decision, which is part of the Administrative Record, speaks for itself. Plaintiff disagrees with Defendant's description of that decision and its rationale to the extent that it is based on materials outside of the Administrative Record.

Respectfully submitted,

/s/ Robert K. Huffman

ROBERT K. HUFFMAN (D.C. BAR NO. 219915)
EMMETT B. LEWIS (D.C. BAR NO. 308627)
MILLER & CHEVALIER CHARTERED
655 Fifteenth Street, N.W.
Suite 900
Washington, D.C. 20005-5701
(202) 626-5824
(202) 628-0858 facsimile

Attorneys for Plaintiff
Sikorsky Aircraft Corporation

*Of Counsel*:

LEAH E. FRAZIER (D.C. BAR NO. 492540)
MILLER & CHEVALIER CHARTERED
655 Fifteenth Street, N.W.
Suite 900
Washington, D.C. 20005-5701
(202) 626-6086
(202) 628-0858 facsimile

Dated: June 5, 2006