IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **SIKORSKY AIRCRAFT CORPORATION,** )<br>)<br>Plaintiff,       )<br>)<br>v.                    )<br>)<br>**UNITED STATES DEPARTMENT OF DEFENSE et al.**  )<br>)<br>Defendants.   )<br>_____) | Civil Action Number: 05-2373 (RWR) |

**MEMORANDUM IN REPLY TO PLAINTIFF'S OPPOSITION
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO
PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT**

In this "reverse" Freedom of Information Act ("FOIA") case the plaintiff, Sikorsky Aircraft Corporation ("Sikorsky") seeks to prevent the defendant, the United States Department of Defense, Defense Contract Management Agency ("DCMA"), from releasing Corrective Action Requests ("CARs") to a New Haven, Connecticut television reporter. DCMA had issued the CARs to Sikorsky in the course of inspecting the latter's production of the Black Hawk helicopter and its variants.

The parties agree that the CARs contain commercial information and that (to the extent such information was obtained from the plaintiff), the plaintiff was required to provide such information to the Government.[1] This being the case, the CARs may be considered confidential

---

[1] In the administrative process Sikorsky argued that both the CARs and Sikorsky's responses to them were voluntarily provided. DCMA agreed with regard to Sikorsky's responses. In its

for Exemption 4 purposes only if their disclosure is likely to either (1) cause substantial competitive harm to Sikorsky, or (2) impair the government's ability to obtain necessary information in the future.  National Parks & Conservation Association v. Morton, 498 F.2d 765, 798  (D.C. Cir. 1974).   Plaintiff contends that release of the CARs would cause it substantial competitive harm and would also impair the government's ability to obtain necessary information in the future.  Both contentions are without merit.

**I.  Plaintiff Fails to Demonstrate That Release of the CARs Would Cause it Substantial Competitive Harm**

> **A.  Exemption 4 Protection Extends Only to Harm Flowing from the Affirmative Use of Confidential Information by a Competitor and Not to Embarrassment Caused by Public Revelations.**

Plaintiff's Memorandum in support of its Opposition and Cross Motion (hereinafter Pl. Opp & Cross Mot.) cites to declarations by company officials predicting that release of the CARs would enable its competitors to "raise doubts" about Sikorsky's quality assurance systems (AR 456), enable competitors to contend that Sikorsky products are "inferior" (AR 450), and put Sikorsky in the defensive position of having to explain to potential customers how the CAR process works. (AR 450).  Pl. Opp & Cross Mot at 6-8.  None of these statements addresses the type of competitive harm covered by Exemption 4.

As plaintiff acknowledges (Pl Opp & Cross Mot. at 9-10), competitive harm under Exemption 4 is limited to the "affirmative use of confidential information by competitors" and "…. should not be taken to mean simply any injury to competitive position, as might flow from

---

Memorandum in Opposition and Cross-Motion for Summary Judgment, Plaintiff abandons any argument that the CARs themselves contain voluntarily submitted information and concedes that the proper test is the National Parks test applicable to information required to be provided.  See Pl. Opposition and Cross Motion.

customer or employee disgruntlement or from embarrassing publicity attendant upon public revelations …." Public Citizen Health Research Group v. FDA, 704 F.2d 1280, 1291, n. 30 (D.C. Cir. 1983).    Here, the above described declarations point to exactly this same type of embarrassment: namely, Sikorsky's concerns about what its customers and the general public will think if the CARs are released to a television station that would in all likelihood publicize their contents.

Plaintiff attempts to equate its alleged injury with that endorsed in McDonnell Douglas Corp. v. United States, 375 F.3d 1182  (D.C. Cir. 2004); by arguing that competitors would make their proposals more attractive in ways in addition to price.  Cross Motion p. 20.  McDonnell Douglas involved the direct use of pricing information in forming a competitive proposal. The Court in McDonnell Douglas stated "[w]e conclude disclosure of McDonnell Douglas's option year prices would likely cause McDonnell Douglas substantial competitive harm by informing the bids of its rivals in the event the contract is rebid." Id. at 1190 (emphasis added).  McDonnell Douglas does not transform embarrassment from public disclosure into substantial competitive harm simply by alleging that competitors will point out the embarrassing information to customers.

**B.  The Plaintiff's Reliance on McDonnell Douglas is Misplaced.**

The plaintiff also points to additional declarations by Sikorsky officials stating that release of the CARs will allow competitors to determine the "the robustness of Sikorsky's quality control systems" and  "the gaps or strengths in those systems" and then "use that information to our detriment when preparing their proposals or marketing materials." (AR 431).   On the basis of these conclusory statements, the plaintiff contends that Sikorsky would suffer the type of harm

that the DC. Circuit had found "… sufficient to demonstrate substantial competitive harm" in McDonnell Douglas Corp. v. U.S. Department of the Air Force, 375 F.3d 1182, 1189 (D.C. Cir. 2004), hereafter McDonnell Douglas.

The plaintiff's sole basis for invoking McDonnell Douglas as support for its competitive harm argument is a single sentence in that decision describing "underbidding" as making a bid "more attractive overall, not with respect only to price, so it will be chosen by the Government." Id. at 1189. Hence, under the plaintiff's reading of McDonnell Douglas, no evidence of Sikorsky's quality control problems, (nor for that matter any negative information concerning any government contractor) could ever be released because its competitors could always use that information to make their own bids "more attractive," if only by pointing to Sikorsky's shortcomings. The plaintiff's reliance on McDonnell Douglas for this proposition is badly misplaced.

### 1. McDonnell Douglas Applies to the Release of Option Prices.

The "more attractive overall" language on which the plaintiff relies appears in a section of the McDonnell Douglas decision entitled "Option Year Prices," (Id. at 1187-90), the final paragraph of which states:

> We conclude disclosure of McDonnell Douglas's *option year prices* would likely cause McDonnell Douglas substantial competitive harm by informing the bids of its rivals in the event the contract is rebid. [FN3]. Consequently, the option year prices fall within the scope of Exemption 4, and the decision of the Air Force to release them was contrary to law.   [Emphasis added].

Id. at 1190.
Thus, the section of the McDonnell Douglas decision on which the plaintiff relies stands only for the proposition that *option prices* under existing contracts fall within the scope of Exemption 4.

4

And, on this same point, it is telling to note that the court inserted a footnote in the above quoted paragraph reading:

> The dissent faults the court for not resolving McDonnell Douglas's additional claim that disclosure of the option year prices in the contract was also likely to cause it competitive harm because its competitors could reverse-engineer certain sensitive pricing factors from the option prices. *See* Dissent at 1200-01. Because we conclude that disclosure of the *option year prices* would likely cause McDonnell Douglas competitive harm by enabling competitors to undercut its prices, *the court has no occasion to continue on in dicta to decide whether McDonnell Douglas would also suffer competitive harm from reverse-engineering of its sensitive pricing factors.* [Emphasis added].

*Id.* at 1190 n.3.

Here, the court has stated a clear intent to limit its holding to the sole dispositive issue before it and not engage in dicta regarding any other alternative theory of competitive harm.

Given the McDonnell Douglas court's clear focus on option prices and stated aversion to engaging in dicta on other theories of competitive harm, it is simply untenable for the plaintiff to cite McDonnell Douglas as authority for extending Exemption 4 protection to quality control information that the court never addressed or even contemplated in rendering its decision.

2. **Plaintiff Takes the "More Attractive Overall" Language Out of Context**.

To understand the context in which the D.C. Circuit used the phrase "more attractive overall" language in McDonnell Douglas requires a careful analysis of both this case and the D.C. Circuit's earlier decision in McDonnell Douglas v. NASA, 180 F.3d 303 (D.C. Cir. 1999), hereafter NASA. In NASA, the District Court had sustained an agency determination that the release of the contract line items prices (subcomponents of an overall contract price) would not cause substantial competitive harm, because, inter alia, "bidders compete on a variety of factors other than price." McDonnell Douglas v. NASA, 981 F. Supp. 12, 16 (D.D.C 1999). In

reversing this decision, the D.C. Circuit summarily disposed of this "factors other than price" argument in the following fashion:

> …NASA did recognize that if disclosure enabled *competitors* to underbid McDonnell Douglas that would constitute harm. [citations omitted]. But the agency "reasoned" that underbidding due to the disclosure would not occur because price is only one of the many factors used by the government in awarding contracts. That response seems too silly to do other than to state it, and pass on.
> [Emphasis in original]

Despite the above quoted language in NASA, the District Court for the District of Columbia subsequently accepted essentially the same argument in approving the Air Force's proposed release of option prices. McDonnell Douglas v. Department of Air Force, 215 F. Supp. 2d 200 (D.D.C., 2002). And it was in deciding an appeal from that decision that the D.C. Circuit used the language on which plaintiff now relies.

In addressing why the release of option years prices would cause competitive harm and why the Air Force's "other factors" argument was no different than the one the Circuit had soundly rejected in NASA, the McDonnell Douglas court stated:

> Simply put, release of the option year prices in the present contract would likely cause McDonnell Douglas substantial competitive harm because it would significantly increase the probability McDonnell Douglas's competitors would underbid it in the event the Air Force rebids the contract. *See Gulf & W. Indus.*, 615 F.2d at 530 (substantial competitive harm likely where disclosure "would allow competitors to estimate, and undercut, its bids"). Because price is the only objective, or at least readily quantified, criterion among the six criteria for awarding government contracts, submitting the lowest price is surely the most straightforward way for a competitor to show its bid is superior. Indeed, price is by statute the only factor that "*must* be considered in the evaluation of a proposal. 10 U.S.C. §2305(a)(3)(A)(ii) (emphasis added). Whether price will be but one of several factors to be weighted equally in any future RFP, therefore, is necessarily somewhat speculative.

> The Air Force nonetheless presses the view, which the district court accepted, that its present argument "differs markedly" from the argument we rejected in *NASA*. *McDonnell Douglas,* 215 F. Supp.2d at 208. The district court restated the Air Force's present argument as follows: "even if underbidding were to occur, the fact that price is just one of many factors means that the effect of underbidding would be diluted by other factors." *Id.* The district court reasoned that unlike the NASA, which had argued competitors would not underbid McDonnell Douglas, the Air Force acknowledged that competitors might underbid McDonnell Douglas but argued the Company would not be harmed because the Air Force would consider nonprice factors in awarding the contract. *Id.* The district court clearly used the term "underbid" to mean "bid a lower price," **but that is not how we used the term in NASA; there "underbidding" refers to making a bid more attractive overall, not with respect only to price, so it will be chosen by the Government.** See *NASA,* 180 F.3d at 303. ("[T]he agency 'reasoned' that underbidding due to the disclosure would not occur because price is only one of the many factors used by the government in awarding contracts"). Obviously, any competitor would try to bid a lower price than McDonnell Douglas; the NASA was not so foolish as to deny that. Instead, the agency there made the same argument as does the Air Force here, *viz.*, that the NASA would not accept a bid merely because it offered a lower price but instead would consider nonprice factors in selecting the winning bid. We rejected this argument summarily in NASA, and we reject it again here for the reason given in the preceding paragraph.
> [Emphasis added].

(McDonnell Douglas, 375 F.3d at 1189-91).

As this context makes clear, the bolded language relates to a distinction between what the D.C. Circuit viewed the district court as meaning by "underbid" and what the Circuit itself had meant in using the same term in NASA. The district court, by basing its decision in McDonnell Douglas, 215 F. Supp.2d at 208, on the premise that even if underbidding did occur, its effect would be diluted by other factors, intended "underbid" to mean bid a lower price *but not necessarily be chosen by the Government* when other factors were considered. In contrast, the Circuit in NASA intended "underbid" to mean making a "more attractive overall" bid that *would be chosen by the Government*. The plaintiff contends that in using this language, the court intended to extend Exemption 4 protection to any information that a competitor could

7

conceivably use to make its bid look more attractive under any award factor.  Indeed, Plaintiff's argument goes even farther to suggest that a competitor's use of negative information to disparage a government contractor  amounts to making a bid "more attractive overall" and thus entitled to Exemption 4 protection.  This view goes far beyond the limited factual context in which the court used this language and ignores what the court actually said about how a competitor could make a bid "more attractive overall."

In the concluding sentence of the paragraph in which this language at issue appears (see above), the D.C. Circuit states that the Air Force's "other factors" argument was being rejected for "the reason given in the preceding paragraph."  And the thrust of that preceding paragraph is that, because *price* is (1) the only award criterion that can be "readily quantified" and (2) also the only criterion that "must" be considered in every award, "submitting the lowest price is surely the most straightforward way for a competitor to show its bid is superior", i.e., more attractive overall.   (See above).  Hence, when read together, the above quoted paragraphs convey one overriding message:  given the paramount importance of price as an award factor, the release of *pricing* information is likely to cause substantial competitive harm because a lower price *alone* can make a bid "superior" or "more attractive overall" and therefore likely to be "chosen by the Government," notwithstanding the presence of other award factors.

Based on the foregoing, it is clear that the <u>McDonnell Douglas</u> court used the language at issue only in the context of a competitor putting its bid in a "superior" or "more attractive overall" position by submitting a *lower price*.  Given this limited context, there is no merit to the plaintiff's contention that this language was ever intended to extend Exemption 4 protection to the release of such non-pricing information as the quality control data (CARs) at issue here.   No

8

such issue was before the court in McDonnell Douglas or *NASA*, and neither decision gave any intimation as to whether such information warranted Exemption 4 protection.

**C.  The Plaintiff's Reliance on Timken and National Parks II is Also Misplaced.**

In citing Timken Co. v. U.S. Customs Services, 491 S. Supp. 557, 560 (D.D.C. 1980) for the proposition that the Exemption 4 protection extends to the information that would, if released, "threaten competitive injury through revealing submitter's competitive strengths [and] weakness," plaintiff again attempts to apply a rule enunciated in a case involving *pricing* information to quality control data (CARs).   Timken involved the Customs Service's refusal to release documents related to custom duty assessments imposed on a Japanese firm on the ground that release of the pricing data underlying these assessments would cause substantial competitive harm.  The court agreed, finding that "…the plaintiff and other competitors could make projections of Koyo's current and future cost and prices based on this same information." Id., at 559.

Further, the language that the plaintiff quotes in its Memorandum appears in a paragraph focused on how competitors could use the information at issue "to determine the company's pricing structure and undercut its bids, and therefore likely cause substantial competitive harm." Hence, as was the case in McDonnell Douglas, the Timken court used the language cited by the plaintiff here solely in the context of pricing.  And, as was the case with McDonnell Douglas, the court in Timken did not address the release of quality control data (CARs).

The same trend continues with the plaintiff's reliance on National Parks and Conservation Association v. Kleppe, 547 F.2d 673, 684 (D.C. Cir. 1976), (hereafter *"National Parks II."*)

There, the plaintiff quotes language describing how the release of financial information would "provide competitors with valuable insights into the operational strengths and weaknesses of a concessioner…" In National Parks II, the information is financial, and the court's paramount concern was that "… in light of the *extremely detailed and comprehensive nature of the financial records* requested by the Association, we consider the likelihood of substantial harm to their competitive positions to be virtually axiomatic." Id, at 684 (emphasis added).  And, due to the nature of this information, the court saw a reasonable basis for concluding that such things as "selective pricing, market concentration, expansion plans and possible takeover bids would be facilitated by knowledge of the financial information the Association seeks." Id, at 684.  This is all in marked contrast to the impact of releasing the non-pricing, non-financial quality control data (CAR) at issue in this case.

   The plaintiff has offered no more than a conclusory statement that the CARs would reveal the strengths and weakness of its quality control systems.  This falls far short of showing how any competitor could, as a practical matter, affirmatively use this CAR information (documenting the shortcomings of various items and operations) to competitively harm the plaintiff.  Unlike the submitters in McDonnell Douglas, Timken, and National Parks II, who could show how the release of option prices, duty assessments, or detailed and comprehensive financial information, would likely lead to substantial competitive harm, the plaintiff can only fall back on the embarrassment, or negative publicity from which Exemption 4 provides no protection.

   The CARs at issue in this case are not financial information, they are government observations of instances of when Plaintiff has in some way violated the contract.  Additionally, Plaintiff does not and cannot show how a competitor could use the information at issue "by

informing the bids of its rivals." McDonnell Douglas, supra. at 1190. All of the cases cited by Plaintiff involve instances where the Court found that a competitor could use the information at issue to alter the competitor's bid. Here, Plaintiff posits that rather than changing its bid the competitor would "raise doubts" about Plaintiff's quality (AR 456) or contend that Sikorsky products are "inferior" (AR 450).

**D.  The Lion Raisins Decision Does Not Support the Plaintiff's Argument.**

The plaintiff attempts to liken the instant case to Lion Raisins v. United States Department of Agriculture, 354 F. 3d 1072 (9th Cir. 2004), which involved the withholding of USDA inspection reports on Exemption 4 grounds. In that case, the reports did not result from the inspection of products being delivered under government contracts, but rather from inspections conducted by USDA agents with authority over various food products. In these reports, inspectors recorded, among other things, information from which Lion could infer the volume of its competitors' raisin sales. The reports were held exempt under Exemption 4 because they contained this financial information, not because negative findings in the reports could be embarrassing to the raisin producers.

In approving the withholding of the above described inspection reports, the court stated in its key finding:

> …Lion could use the information from the Line Check Sheets to its advantage by cutting its prices for the types of raisins its competitors pack in large volumes in order to underbid them…

So, once again, a court decision on which the plaintiff relies is focused on the issue of pricing, i.e., whether the information at issue would enable Lion Raisins to underbid its competitors.

And, once again, the plaintiff is attempting to apply the reasoning of a decision premised on how the information at issue could *undercut prices* to quality control data having no bearing on prices.

The plaintiff, in an effort to buttress its reliance on Lion Raisins, contends that the CARs give a far more detailed picture of Sikorsky's operations than the USDA inspection reports give of raisin producer operations in Lion. Even if true, the contention is irrelevant. The main point is that the inspection reports in Lion Raisins contain financial information that could be used to underbid a competitor based on price, and the CARs provide no such information.

Plaintiff then goes on to make two other points. The first is that Sikorsky's name is on the CARs while the names of the contractors covered by the USDA inspection reports had to be inferred, and the second is that the CARs identify helicopters by name and number, while the exact type of raisins being inspected by USDA can only be inferred. Since both the plaintiff and the military departments routinely publicize the awards of any government helicopter contracts that Sikorsky receives, it is difficult to see how Sikorsky can be harmed by entries on a CAR showing it was producing these same helicopters. So any comparison of the plaintiff's status to that of unknown raisin producers is simply inapt.

Plaintiff finally contends that release of the CARs would give a competitor insight into Sikorsky's production schedule. This argument was not raised during the administrative phase and should thus be ignored by the Court. Additionally, the CARs would reveal only military production schedules and not Plaintiff's civilian production schedules. Second, these military production or delivery schedules are normally included in the publicly available Requests for Proposals that result in military contract awards.

"See Federal Acquisition Regulation (FAR) provisions requiring that, with few exceptions, the Government's contract actions be publicized (48 CFR Part 5) and competitively awarded (48 CFR Part 6), that "the time of delivery or performance is an essential contract element and shall be clearly stated in solicitations" (48 CFR 11.401(a)), including both invitations for sealed bids (48 CFR 14.201-2(f)) and requests for proposals under negotiated contract procedures (48 CFR 15.204-2(f)).

**E.  The Public Interest Outweighs Any Competitive Harm Flowing From Release of the CARs**

As the court observed in National Parks II, "Congress enacted the Freedom of Information Act to ensure comprehensive public access to government records, limited only by certain narrowly-construed exemptions enacted to protect other important interests." Id. at 678. Therefore, any effort to withhold information sought under the FOIA must involve a balancing of this strong congressional mandate in favor of disclosure against narrow construction of the exemptions stated in the Act.  See Environmental Protection Agency v. Mink, 410 U.S. 73, 80, (1973).

In applying the above-described balancing test to the instant case, Sikorsky's proffered reasons for withholding CARs (amounting to no more than claims of embarrassment or bad publicity) pale in comparison to the public's right to know whether vitally needed military helicopters worth millions of taxpayer dollars meet contract requirements.  Given this clear showing of overriding public interest, the FOIA requires release of the CARs and the plaintiff's objection must fall.

**II. Plaintiff Fails To Show That Release Of The Information Will Impair The Government's Ability To Collect Such Information In The Future**

    **A. DCMA Applied the Appropriate Legal Standard**

Plaintiff contends that DCMA applied the wrong legal standard by determining that release of the information would not *significantly* impair the government's ability to obtain similar information in the future.  Cross Motion p. 13.  Plaintiff claims that the appropriate standard only requires a showing that release is "likely to impair."  However, Plaintiff ignores the D.C. Circuit's holding in <u>Washington Post Co. v. United States Dep't of Health & Human Services</u>, 690 F.2d 252 (D.C. Cir. 1982), requiring that the impairment be "significant" to overcome the disclosure mandate of FOIA.  The Court stated: "[a] minor impairment cannot overcome the disclosure mandate of FOIA.  Rather, the question must be whether the impairment is significant enough to justify withholding the information." *Id.* at 269.

Plaintiff also contends that DCMA erred in determining that release of the CAR's would not impair its ability to collect necessary information in the future because it based this determination on the fact that the Plaintiff and other contractors are contractually required to submit to the inspections.  Plaintiff argues that "National Parks, however, does not require a showing that release of the information will impair the government's ability to get the *same* information in the future; rather it requires a showing that release of the requested information would impair the government's ability to obtain *necessary* information in the future.  Pl. Mem Op & Cross Mot at 17 (emphasis in the original).   Plaintiff argues that while DCMA can obtain the same information being released in the CARs, it will not be able to obtain other "necessary" quality assurance information in the future.  This argument is meritless.

The Court in National Parks, in analyzing the information at issue in that case stated "Since the concessioners are required to provide this financial information to the government, there is presumably no danger that public disclosure will impair the ability of the Government to obtain *this* information in the future." National Parks & Conservation Asso. v. Morton, 498 F.2d at 770 (emphasis added). Obviously, the National Parks Court was referring to the government's ability to obtain the information at issue in the future. The term necessary simply established a criteria that the information at issue had to be "necessary" in order for the government's impairment to overcome the presumption of releasability under the FOIA.

When information is required to be submitted, "the governmental impact inquiry will focus on the possible effect of disclosure on its quality." Judicial Watch, Inc. v. Export-Import Bank, 108 F. Supp. 2d 19, 29 (D.D.C. 2000); quoting Critical Mass, 975 F.2d at 878. Plaintiff makes no argument that the quality of the information the government receives related to CAR's will decrease but rather argues that Plaintiff will retaliate by withholding other quality control information.

**B. Deferral to the Government Is Appropriate**

The government is in the best position to determine the effect of disclosure on future bidding situations. As a result, courts should defer to the administrative agency's determination that release will not cause impairment. McDonnell Douglas Corp. v. NASA, 981 F. Supp. 12, 15-16 (D.D.C. 1997), rev'd on other grounds 180 F.3d 303 (1999). Plaintiff argues that the rationale for deference stated in McDonnell Douglas Corp. v. NASA, is not present because this case involves the day to day interaction between the contractor and the government rather than a future bidding situation. Pl. Opp & Cross Mot at 18. However, other courts applying this

standard have had no difficulty applying it to the administration of contracts. This Court has held that the rationale for showing deference in such cases is that the agency "has an incentive not to release information which will impair its future ability to successfully contract," and therefore if the agency is willing to release information, it can be safely assumed that the agency is acting to protect its ability to contract in the future and to obtain the information *necessary to administer those contracts*. Ctr. for Pub. Integrity v. DOE, 191 F. Supp. 2d 187, 196 (D.D.C. 2002) (emphasis added).

Plaintiff cites three cases for the proposition that an agency's determination of no likely impairment must be set aside if the party seeking withholding produces a "detailed factual justification" showing that disclosure will impair the government's ability to acquire the information in the future. The first, Washington Post Co. v. United States Dep't of Health & Human Services, 690 F.2d 252, 255 (D.C. Cir. 1982), is a FOIA case requiring the agency to make a detailed factual justification for withholding. It does not address the deference due an agency's determination that its ability to obtain information will not be impaired. The second, Artesian Industries, Inc. v. Department of Health & Human Services, 646 F. Supp. 1004, (D.D.C. 1986), in rejecting a claim very similar to Plaintiff's stated:

> Artesian argues that if HHS discloses the memorandum at issue, businesses from whom the government requests information in the future will withhold as much information as possible by reading the term "necessary" very narrowly. In addition, businesses will thereafter view governmental requests for information adversarially, causing the government greater expenses, delays, and inefficiencies. The plaintiff provides no support for this argument, and similar reasoning has been rejected in this jurisdiction. See Dynalectron, supra, memorandum, No. 83-3399 at 9.
>
> More properly, the Court is guided by the reasoning of Washington Post Company v. HHS, 223 U.S. App. D.C. 139, 690 F.2d 252 (D.C. Cir. 1982). In this decision,

> the United States Court of Appeals for this Circuit held that a party must produce a "detailed factual justification" showing that disclosure will impair the government's ability to acquire this information in the future before a court will direct an agency to withhold information. Id. at 269. As usual, the burden of proof is on Artesian, the party seeking to avoid disclosure. 5 U.S.C. § 552(a)(3); Kleppe, supra, 547 F.2d at 679 n.20.  Artesian has provided no factual evidence to support its conclusion that the information in its memorandum is confidential; thus, its argument fails.

*Id*. at 1009-1010 (D.D.C. 1986).  The third case, an unpublished District Court case only addressed the impairment prong in a footnote stating:

> Alternatively, plaintiff could establish its exemption by showing that disclosure would impair the government's ability to obtain necessary information in the future. National Parks and Conservation Ass'n v. Morton, 498 F.2d 765, 770 (D.C. Cir. 1974). Plaintiff raised this issue in its trial brief at 7-8, but offered no evidence to support the argument at trial. It thus has failed to carry its burden of proof.
>
> American Scissors Corp. v. GSA, 1983 U.S. Dist. LEXIS 11712, n.2 (D.D.C. 1983).

Defendant is aware of no case where the Court has found the government's ability to acquire information will be impaired where the agency itself has determined that no impairment is likely.  As noted by the D.C. Circuit in McDonnell Douglas Corp. v. NASA, supra at n.2, the Fourth Circuit has held that a contractor has no standing to raise an impairment argument. Hercules v. Marsh, 839 F.2d 1027, 1030 (4th Cir. 1988).  The Court need not determine whether it is ever possible for a submitter to make such a showing because Plaintiff clearly has not made an adequate factual showing in this case.

Plaintiff's allegations that it will take steps to hinder DCMA's ability to gain the information are irrelevant because the information at issue, government observations contained in CARs, was gained in the course of contractually authorized inspections.  AR 254, DEX 1 to Defendant's Motion for Summary Judgment ¶ 15a.  In rejecting a similar argument, this Court

noted "Interestingly enough, Boeing at no point represents that should USAF disclose the contested information here, it would no longer apply for government contracts that required submission of information regarding the bidder's costs." <u>McDonnell Douglas Corp. v. United States Dep't of the Air Force</u>, 215 F. Supp. 2d 200, 206, n.4 (D.D.C. 2002), <u>rev'd in part on other grounds</u>, 375 F.3d 1182 (D.C. Cir. 2004).  Similarly, Plaintiff here does not allege that it would stop bidding on government contracts.  Because the contracts require submission to the inspections that lead to the CARs, the lesser steps Plaintiff contends it would take would not significantly impair the government's ability to gain similar information in the future.

### C.  The Decision by a DCMA Initial Denial Authority, Overturned by DCMA Headquarters on Administrative Appeal, Is Irrelevant

In contending that the agency decision in this case is arbitrary and capricious, Plaintiff points to a contrary decision by the DCMA Initial Denial Authority (IDA).  But that decision, concluding that the release of CARs would impair DCMA's ability to obtain similar information in the future, was overturned on appeal.  Plaintiff's continued citing to the IDA's findings is disingenuous at best.  Since the decision of an IDA is appealable to the head of agency under 5 U.S.C. § 552(a)(6)(A), it is obviously not binding on the agency as a whole.  And, the IDA decision upon which Plaintiff relies was in fact overturned by DCMA headquarters on administrative appeal.

## Conclusion

DCMA's decision was based on a consideration of the relevant factors and the agency's rationale can be readily discerned from the Administrative Record.  DCMA's decision to release the requested documents with redactions is neither arbitrary, capricious nor contrary to law.

Rather the release of the documents is compelled by, and consistent with the goals of, the FOIA. Accordingly, for the foregoing reasons and those in Defendant's initial Motion, Defendants are entitled to Summary Judgment.

Respectfully submitted,

_____/s/_____
KENNETH L. WAINSTEIN, D.C. Bar #451058
United States Attorney


_____/s/_____
RUDOLPH CONTRERAS D.C. Bar No. 434122
Assistant United States Attorney


_____/s/_____
KEVIN K. ROBITAILLE
Special Assistant U.S. Attorney
555 Fourth Street, N.W., 10th Floor
Washington, D.C. 20530
(202) 353-9895